# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-2048V
UNPUBLISHED

| | |
|---|---|
| MARGIE S. KEELING, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 19, 2022 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Dismissal; Statutory Six-Month Severity Requirement; Insufficient Evidence; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA). |
| Respondent. | |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Mallori Browne Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION[1]

On December 30, 2020, Margie S. Keeling ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on October 17, 2019, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

("SPU") of the Office of Special Masters. For the foregoing reasons, I find that Petitioner has provided insufficient proof that the claimed injury was sufficiently severe for consideration under the Vaccine Program. Therefore, the Petition must be dismissed.

## I.   Relevant Procedural History

The Petition's last medical record citation is from approximately four months post-vaccination. Petition (ECF No. 1) at ¶ 8 (citing Ex. 4 at 4-6); accompanied by Exs. 1-5 (medical records; no affidavit from Petitioner). Nevertheless, the Petition alleged injuries and sequelae lasting *more* than six months and averred that updated medical records had been requested and would be filed upon receipt. Petitioner subsequently filed some additional records (Exs. 6-7), but the accompanying PAR Questionnaire (ECF No. 11) did not indicate that she underwent any further medical treatment for the injury alleged.

The case was assigned to the SPU on September 21, 2021. Activation and Reassignment Order (ECF No. 14). During the initial status conference, Petitioner was ordered to obtain any outstanding records of medical treatment and/or prescriptions, as well as any other evidence that her injury lasted for at least six months after vaccination, as required under the Vaccine Act's severity requirement.[3] Scheduling Order filed November 1, 2021 (ECF No. 17). Afterwards, Petitioner filed additional medical records (Ex. 9)[4] as well as pharmacy prescription records (Ex. 10). In addition, Petitioner and her husband offered their recollections of relevant facts including the severity question (Exs. 8, 11).[5] On March 4, 2022, Respondent maintained that the evidence still did not establish six months' severity. Status Report (ECF No. 25).

On March 15, 2022, I reiterated that Petitioner should file any additional evidence pertaining to the prescription of certain medications during the initial six-month period, as well as any supplemental affidavits pertaining thereto. Scheduling Order (ECF No. 26). Petitioner did not avail herself of the opportunity, filing a supplemental Statement of Completion (ECF No. 27) without any other evidence.

---

[3] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

[4] Based on my own review and the parties' briefing, Exhibit 9 contains medical records which were previously submitted – and does not contain any updated medical records evidencing a left shoulder injury persisting for at least six months.

[5] Petitioner's statement is dated December 8, 2021. Ex. 8. Her husband's statement is not dated, but was filed on January 11, 2022. Ex. 11. Each statement is labeled as an "Affidavit" and acknowledges that the statement "will be filed in connection with" Ms. Keeling's petition under the Vaccine Program. However, each statement lacks notarization or alternatively, any attestation of truth and accuracy in accordance with 28 U.S.C. § 1746 (providing that such a statement will be accorded "the same force and effect").

On May 12, 2022, Petitioner was ordered to show cause why her case should not be dismissed for failure to establish the severity requirement. She was again specifically directed to file any outstanding medical records and/or supplemental affidavits regarding the prescription medications, in addition to briefing the issue. Order to Show Cause (ECF No. 28) (setting Petitioner's original deadline as July 11, 2022); *see also* Petitioner's Unopposed Motion for Extension of Time until August 10, 2022 (ECF No. 29), granted that same day by Order (Non-PDF).

On August 10, 2022, Petitioner filed a Motion for a Ruling on the Record focused on the severity issue. Motion (ECF No. 30). Petitioner did not, however, submit any additional evidence as suggested by the previous Order to Show Cause. On September 9, 2022, Respondent responded that the evidence still did not support a factual determination of severity in Petitioner's favor. Response (ECF No. 31).

Petitioner did not avail herself of the opportunity to file any Reply by the deadline set to do so. I have determined that the parties have had sufficient opportunity to develop the relevant facts and arguments pertaining to the alleged injury's severity and that a finding on that issue is necessary.[6] Thus, this matter is now ripe for adjudication.

## II.  Applicable Legal Standard

A petitioner carries the burden of establishing the matters required in the petition by a preponderance of the evidence. Section 13(a)(1)(A). One such requirement is "documentation demonstrating that [the petitioner][7] ... suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i); *see also Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

---

[6] In his Response Brief, Respondent noted that he had not completed a medical review of the case, which had been pending in SPU for approximately 12 months at that time – and approximately 13 months now, at the time this decision is being issued. I find it appropriate to issue the decision at this time in the interest of preserving Program resources for other cases.

[7] Or other vaccinee, e.g., a minor or other person who is unable to represent his or her own interests, on behalf of whom the claim is brought.

Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

The Act prohibits finding that a petition requirement has been established "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). Medical records must thus be considered (*see* Section 13(b)(1)) and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)).

However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Rather, factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

### III. Relevant Evidence

I have reviewed all of the evidence filed to date. This ruling, however, is limited to determining facts pertaining to the severity of the injury alleged. Accordingly, I will only summarize or discuss evidence that directly pertains to this issue. Specifically:

- At Petitioner's request, the University of Mississippi Medical Center supplied approximately two hundred (200) pages – reflecting a "full and complete copy" of all internal medicine, sleep medicine, orthopedics, and other medical records relating back to three years prior to vaccination. Ex. 6 at 1-2. Her medical history included thyroid disease, anemia, hypertension, sleep apnea, unspecified surgery on her right shoulder, and surgery for right-sided carpal tunnel syndrome. *See* Ex. 6 at 116.

- On October 17, 2019, Petitioner (at 63 years old) presented to an internal medicine physician, Mary Morgan McLeod, M.D., to address the aforementioned chronic conditions as well as an ingrown toenail. The records do not reflect any complaints relating to the left shoulder or need/recommendation for any vaccinations. Ex. 6 at 120-28. On that same date, Petitioner received the subject flu vaccination in her left deltoid muscle at a local pharmacy. Ex. 1 at 5.[8]

- The next contemporaneous records are of pharmacy prescription fillings or renewals – without any corresponding medical encounters or other context. Namely:

    - On October 22nd, Anna Elizabeth Case, M.D. (another internal medicine physician affiliated with University of Mississippi Medical Center), reviewed Petitioner's allergies, then prescribed a 10-day supply of methocarbamol[9] 500 mg which Petitioner filled the same day. Ex. 6 at 128; Ex. 10 at 2.

    - On October 23rd, Dr. Case prescribed and Petitioner filled a 90-day supply for gabapentin 300 mg. Ex. 10 at 2 (pharmacy records); *see also* Ex. 6 at 132 (University of Mississippi medical records reflecting that the medication was "E-Prescribe[d]" on that date).

    - On November 11th, Dr. McLeod prescribed and Petitioner filled a 12-day supply of diclofenac sodium 1% topical gel.[10] Ex. 10 at 2; *see also* Ex. 6 at 132.

- On November 18, 2019, Petitioner presented to orthopedist William Geissler, for an initial evaluation of left shoulder pain since the flu vaccination. She reported "currently taking gabapentin and muscle relaxers for this. She has tried rest, ice packs, and Voltaren[11] cream." Ex. 6 at 141; *see also id.* at 131-32 (reflecting these

---

[8] Petitioner recalls that she was required to go elsewhere for the vaccination because Dr. McLeod did not have the high-dose vaccine recommended for seniors. Ex. 8 at ¶ 2. Petitioner recalls that she traveled directly from the appointment with Dr. McLeod to CVS, where she received the vaccine. *Id.* at ¶ 3.

[9] Methocarbamol is a muscle relaxant. *Dorland's Medical Dictionary Online* (hereinafter "*Dorland's*"), https://www.dorlandsonline.com (last accessed October 12, 2022).

[10] Diclofenac is a nonsteroidal anti-inflammatory drug ("NSAID"). *Dorland's*. Diclofenac sodium is administered orally to treat osteoarthritis, among other conditions. *Id.* The internal medicine records indicate that Petitioner previously filled prescriptions for diclofenac oral tablets (Cataflam) in November 2015, November 2016, and November 2017. *See* Ex. 6 at 18, 26, 61.  Petitioner has not filed pharmacy prescription records from before November 1, 2019.

[11] Voltaren is a trademark for preparations of diclofenac sodium. *Dorland's*.

5

current medications "at start of encounter"); *id.* at 134-37 (new patient questionnaire completed three days earlier). An x-ray revealed "[s]mall calcific densities along the inferior margin of the glenohumeral joint… which could reflect sequela of remote soft tissue injury" and "mild acromioclavicular joint osteoarthritis." Ex. 3 at 32.

Dr. Geissler directed Petitioner to begin a course of physical therapy ("for left shoulder ROM and strengthening 2-3x a week for 6 weeks") and continue the existing prescriptions for gabapentin and diclofenac sodium gel. Ex. 6 at 132, 141, 146. She should "check back in 2 months. If no improvement, consider an injection or MRI." *Id.* at 141. Dr. Geissler subsequently added that Petitioner had opted for a left shoulder steroid injection during their encounter. *Id.* at 134.

- On November 22, 2019, Petitioner presented for an initial evaluation at Results Physiotherapy. Ex. 2 at 8. She reported left shoulder pain of 7-10/10. *Id.* She had taken gabapentin and a muscle relaxant for two weeks with "no relief." *Id.* The recent steroid injection had provided "some relief." *Id.* The therapist documented a symptomatic rotator cuff ("RTC") with weak and painful resisted external rotation; trigger points in the upper trapezius and scalene muscles; and decreased mobility in the cervical spine. *Id.* at 10. He planned a course of 3 visits per week for 4 weeks. *Id.* at 11.

- Further PT sessions took place on November 27; December 2; and December 4, 2020. Ex. 2 at 14-23. On December 9th, the therapist amended the schedule to just twice a week due to Petitioner's "financials and decreased pain in neck/ L shoulder." *Id.* at 24-26. She felt "much better overall" on December 13th. Ex. 2 at 27-29. By a December 20th reevaluation, Petitioner had "responded well" to treatment; her pain was significantly less frequent and less intense – now ranging from 0-7/10. *Id.* at 33-35. On December 23rd, she reported "no pain at night/ with sleep last 2 nights" and "no reports of pain with exercises." *Id.* at 39-41. On December 30th, Petitioner had "mild pain in neck with open books to R. No reports of pain with other exercises." Ex. 2 at 42-44.

- On January 2, 2020, the PT practice noted that Petitioner had "self-discharged." Ex. 2 at 45. A formal discharge summary (prepared approximately one month later without Petitioner returning to the practice), states that she had attended a total of 9 visits over 6 weeks; achieved improvements in shoulder ROM and strength to within normal limits; had abandoned goals upon self-discharge on January 2nd; and exhibited a good prognosis "in conjunction with a home exercise program." The

discharge summary also notes that Petitioner was "transfer[ring] to other facility." Ex. 2 at 46-48.[12]

- On January 9, 2020, Petitioner presented to an occupational therapy ("OT") practice, Jackson Hand and Upper Extremity Center, for an initial evaluation of left shoulder pain currently rated at 7/10. Prior therapy had delivered "only mild improvements." Ex. 3 at 6, 11-12. The left shoulder had normal strength, however, palpation elicited pain at the anterior bursa, lateral humerus, and upper trapezius. *Id*. At the same encounter, Petitioner also reported a history of right carpal tunnel syndrome and requested "tx of her right hand for numbness and pain." Ex. 3 at 6. Following examination, the therapist's assessments were right-sided osteoarthritis ("OA") and carpal tunnel syndrome ("CTS"). *Id.* at 7. The therapist planned to address both issues, at 3 visits per week for 4 weeks. *Id.* at 7.

- At the first OT session on January 13, 2020, Petitioner had severe muscle tightness on her lateral triceps and upper trapezius muscles; her pain was much better after treatment including dry needling. Ex. 3 at 26-27.

- At the second OT session on January 20, 2020, Petitioner reported that she was feeling much better and her left upper arm pain was "gone." Ex. 3 at 28. While she reported upper trapezius tightness, that was not verified on objective exam. *Id.* The therapist planned to "see if she gets orders for hand." *Id.* at 29.

- At her January 22, 2020, orthopedics follow-up, Petitioner reported that her left shoulder was "getting better, but she want[ed] to continue her [OT]." Ex. 6 at 155. On physical exam, Dr. Geissler documented good range of motion and no tenderness at the AC joint, but "mild" pain with Neer and Hawkin signs, and "mild" pain upon abduction and forward flexion of the rotator cuff. *Id.* Dr. Geissler's assessment was "resolving rotator cuff syndrome." *Id.*

    Petitioner also reported pain at the base of her right hand and tingling over the dorsum of the thumb and index finger. Ex. 6 at 155-56. Physical exam found no atrophy but point tenderness and a positive Grind test. *Id.* at 156. An x-ray revealed "advanced osteoarthritis in the thumb particularly at carpometacarpal ["CMC"] joint. Osteoarthritis throughout interphalangeal joints within the hand." Ex. 4 at 2-3.

---

[12] The PAR Questionnaire says that last date of service at Results Physiotherapy was on December 30, 2020. This is most likely a typo and should read "2019," given that Petitioner completed the PAR Questionnaire on May 21, 2020.

7

As of that date, Dr. Geissler planned for Petitioner to continue therapy for her shoulder and start therapy for her right hand, 2-3 times per week for 6 weeks. She would follow up "as needed." Ex. 6 at 154-56.

- On February 19, 2020, Petitioner returned to the OT practice for reevaluation. It was noted that she had only attended two sessions before an absence due to kidney stones. Ex. 4 at 4. Petitioner reported that her "shoulder is better from your treatments," and she "only ha[d] very mild pain in [her] arm." *Id.* Objective examination documented normal range of motion, but "pain at AC joint and bursa." *Id.* The therapist also recorded "cont. weakness of the rotator cuff." *Id.* at 5. The left shoulder was treated with phonophoresis, dry needling, and sensory re-education. *Id.* The therapist then turned to Petitioner's right hand, providing an orthotic brace to be worn on a nightly basis. *Id.* at 5, 16. The therapist planned further treatment twice a week for 1 month (without specifying whether that would be for the left shoulder versus right hand). *Id.* at 5.

- On March 27, 2020, Petitioner obtained another 12-day supply of diclofenac sodium 1% topical gel, which was again prescribed by the internal medicine physician Dr. McLeod. Ex. 10 at 2 (consistent with prior prescription on November 11, 2019).

- The only further medical records are with a gastroenterologist on May 5, 2020, and the internal medicine physician Dr. McLeod on June 25, and September 17, 2020. Ex. 6 at 179-227; *see also* PAR Questionnaire (ECF No. 11) and Motion (ECF No. 30) (not identifying further encounters for the left shoulder). These medical records do not document or rule out continued shoulder pain.

- In her statement dated December 8, 2021, Petitioner stated that she and her husband both had medical conditions which increased their risk of death in the event of contracting COVID-19. Most people in their area (Jackson, Mississippi) were "not that cautious" and refused to wear masks. Petitioner recalls that COVID-19 was "why I ended PT (around February of 2020), worked my shoulder at home, and continued medications. I started with Gabapentin and Methocarbamol. Later, I used Diclofenac Gel and OTC Aleve." Petitioner recalled that for some unspecified period of time, her husband took over most household chores and helped her to dress while she had limited range of motion in her left shoulder. They also got some help with house cleaning. Ex. 8 at ¶ 4.

Petitioner recalled more specifically that: "On my husband's birthday, September 7, 2021, I took over the kitchen and prepared our food that night. Shoulder was

greatly improved. By Christmas, the pain was gone…" Ex. 8 at ¶ 5.[13] Petitioner concludes her statement by stating that her left shoulder injury and residual effects persisted for at least six months. Ex. 8 at ¶ 6.

- In his undated statement filed on January 11, 2022, her husband recalled that after the October 17, 2019, flu vaccine, Petitioner went back to her internal medicine physician Dr. McLeod, who prescribed medications for her left shoulder pain. Ex. 11 at ¶ 3. The husband recalled that Petitioner then went to the orthopedic surgeon Dr. Geissler, and to "regular" PT appointments. *Id.* at She performed home exercises "regularly" and "continues to use the exercise guide." *Id.* The husband recalled taking over household tasks at some unspecified time, and that Petitioner "still" has interrupted sleep and difficulty reaching overhead. *Id.* at ¶ 4.

## IV. Analysis

Petitioner has correctly stated that she must establish that her shoulder pain persisted past April 17, 2020, to fulfill the statutory severity requirement. Motion at 5. Although she cannot point to treatment events around or after that date, she seeks to establish severity a different way – by emphasizing that she was prescribed diclofenac topical gel on November 11, 2019, and again on March 27, 2020 (5 months and 10 days post-vaccination). *Id.* However, while I recognize that the November 18, 2019, orthopedics record supports that Petitioner at least initially applied that medication to her shoulder, there is no indication that it was indicated or useful for that purpose later. Petitioner has otherwise repeatedly failed to provide additional context for these prescriptions, which were written by internal medicine physicians. Ex. 10 at 2.[14]

---

[13] In light of Petitioner's statement being dated on December 8, 2021, it seems more likely than not that she is describing her pain on her husband's birthday versus Christmas in *2020*.

[14] I previously noted this discrepancy in my Order to Show Cause:

> [The prescription records] d[o] not assist Petitioner's severity showing – except to the extent that she can establish that she later continued to take these medications for left shoulder pain, despite the otherwise-documented cessation of formal treatment. Petitioner should therefore address whether these prescriptions were provided with the intention of treating her shoulder pain, and furthermore whether her act of refilling the diclofenac topical gel on March 27, 2020 (five months and ten days after vaccination), supports the conclusion that she had ongoing shoulder pain at least on that date. Ex. 10 at 2. However, I am not prepared to accept that explanation unless, at minimum, Petitioner and her counsel confirm that they have exhausted efforts to obtain any outstanding documentation (of medical appointments, as well as telephonic and electronic correspondence) that would explain how those prescriptions came about. Petitioner shall also file another affidavit addressing how and why her providers initially wrote those prescriptions.

Order to Show Cause at 2.

The available evidence indicates that Petitioner had previously been prescribed at least the oral formulation of the same medication – but potentially for longstanding, unrelated carpal tunnel syndrome and/or osteoarthritis. Those issues remained active, as evidenced by the orthopedics and occupational therapy assessments and provision of the orthotics brace in February 2020. *Accord* Response at 6 (noting these concurrent conditions). But they are independent of the SIRVA injury.

Petitioner also argues that the existing medical records do not establish total improvement of her left shoulder. Motion at 6, citing Ex. 2 at 46 (February 6, 2020, discharge summary containing a pain rating of up to 7/10); *but see id.* at 33-45 (indicating that Petitioner provided that pain rating on December 20, 2019; she was not asked for an updated pain rating; and that she self-discharged on January 2, 2020). But upon review, the medical records indicate that Petitioner's left shoulder pain was mild as of February 2020 and it was expected to improve within *less than* six months from the date of vaccination. *Accord* Response at 5-6.[15]

I have reviewed the later witness statements attesting to severity, but they are insufficient to outweigh the medical records. Petitioner does not address the origin of the diclofenac gel or her concurrent medical conditions. And while she specifically recalls that her left shoulder pain "greatly improved" by her husband's birthday on September 7, 2020, and was "gone" by Christmas 2020, I cannot accept her claims alone – and they are not consistent with her husband's statement, which state that her pain *continued* at least through 2021. Moreover, the statements are not notarized or otherwise submitted under penalty of perjury, further reducing the weight they should be afforded.[16]

---

[15] As previously observed: "It would not necessarily be expected that Petitioner would have complained of, or that her gastroenterologist would have independently perceived, shoulder pain and dysfunction during their encounter on May 5, 2020. Nevertheless, there is a lack of documentation from at least two subsequent primary care encounters on June 25th and September 17th, 2020, and no evidence of any treatment for shoulder-related issues thereafter." Order to Show Cause at 2. The lack of objective documentation of left shoulder pain in these records – or at any time thereafter – further weakens Petitioner's case.

[16] I have also considered Petitioner's explanation that she discontinued active treatment in mid-February 2020 due to the emerging COVID-19 pandemic, and that she and her husband had specific comorbidities increasing their risk. Motion at 6; *see also* Response at 5 (acknowledging that this explanation is at least "broadly plausible" despite questioning the exact timing of the pandemic). I give some weight to the fact that at the outset of the pandemic, individuals reasonably curtailed (or even avoided) medical treatment for non-emergency matters, and that in many cases this could explain a treatment gap. However, Petitioner's later explanation does not outweigh the more contemporaneous medical records, which indicate that her left shoulder was improving. And there is not evidence in this case that *later in 2020* or even thereafter, the Petitioner sought treatment for shoulder-related problems.

As it stands, the evidence suggests overall that while Petitioner may in fact have experienced a SIRVA, it was fortunately a less serious injury that was improving over time, and did not necessarily require formal medical treatment to resolve. Petitioner has thus not carried her burden to establish severity.

## V.    Conclusion

Petitioner has presented insufficient proof to establish the severity requirement. Section 11(c)(1)(D). Therefore, she is ineligible to pursue compensation under the Program. In the absence of a timely-filed motion for either reconsideration or review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.